**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LEAH MARIE FRENCH,

|  |  |
|---|---|
| | CASE NO. 15-12687 |
| *Plaintiff*, | DISTRICT JUDGE SEAN F. COX |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 16)

**I.**      **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that French is not disabled. Accordingly, **IT IS RECOMMENDED** that French's Motion for Summary Judgment (Doc. 13) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

**II.**      **REPORT**

      **A.**      **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims under the Disability Insurance Benefits ("DIB") of Title II of the Social Security Act 42 U.S.C. § 401 et seq., and the Supplemental Security Income

Program ("SSI") of program of Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 16).

Plaintiff Leah French was forty years old as of March 7, 2014, the date of the ALJ's decision. (Tr. 36, 193). Her applications for benefits were initially denied on June 26, 2012. (Tr. 83, 96). French requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ David Mason on October 22, 2013. (Tr. 42-82). French, represented by attorney Steven Harthorn, testified, as did Amy Hellen, a mental health therapist who worked with French, and vocational expert ("VE") John Stokes. (*Id*.). On March 7, 2014, the ALJ issued a written decision in which he found French not disabled. (Tr. 17-36). On June 5, 2015, the Appeals Council, after reviewing additional exhibits, denied review.[1] (Tr. 1-3). French filed for judicial review of that final decision on July 31, 2015. (Doc. 1). The parties have submitted their motions for summary judgment. (Docs. 13, 16). On March 31, 2016, French submitted a reply brief that essentially duplicates the arguments in her motion for summary judgment. (Doc. 17).

**B.     Standard of Review**

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the Court can consider only that evidence presented to the ALJ. In other words, French's Appeals Council evidence may not be considered for the purpose of substantial evidence review. (Tr. 4, 625-33).

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

3

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that

4

she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found French not disabled under the Act. (Tr. 36). The ALJ found at Step One that French had not engaged in substantial gainful activity following the alleged onset date, October 24, 2007. (Tr. 22). At Step Two, the ALJ concluded that French had the following severe impairments:

5

"major depressive disorder recurrent; bipolar disorder; migraine headaches; and psoriasis." (*Id*.). At Step Three, the ALJ found that French's combination of impairments did not meet or equal one of the listed impairments. (Tr. 23). The ALJ then found that French had the residual functional capacity ("RFC") to perform light work, except with limitations as follows:

> "[S]he would be limited to routine, repetitive work tasks; simple work with few if any workplace changes and free of any fast pace production; only simple work-related decisions; brief/superficial contact with coworkers, supervisors, or the general public; no tandem tasks; and would be off task up to eight percent of the day, but could remain on task for two hour segments at one time, except that she could be off-task for one minute per hour or two minutes every two hours. Additionally, she would require a sit/stand option in that she could sit for one hour at a time, but would need to change position to stand or move around after 30 minutes of sitting for two minutes, while still remaining on-task to some degree. In total, she could sit for six out of eight hours, and stand or walk for two out of eight hours. She could not have concentrated exposure to excessive  heat, cold, humidity, noise, dust, dust, fumes, odors, gas and poorly ventilated areas, and could not work with concentrated exposure to hazards, such as unprotected heights or the operational control of moving machinery. Lastly she was limited to frequent handling, fingering, feeling, pushing, or pulling.

(Tr. 24-25). At Step Four, the ALJ found that French could not return to her past relevant work. (Tr. 35). At Step Five, the ALJ concluded that French retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 35-36).

6

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed French's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.    French's Function Report

French completed a function report on May 10, 2012, in which she asserted that her illnesses caused anxiety, paranoia, stress and depression, disrupted her thought processes, caused headaches, low energy, and weakness, hair loss, psoriasis, swelling, and panic attacks. (Tr. 249). As to her daily activities, French stated that she took care of her daughter and visited stores with assistance from others. (Tr. 250). French complained that her maladies prevented her from multitasking, having organized thoughts, handling business, and caused her to freeze or panic. (*Id.*). She had interrupted sleep, racing thoughts, crying, and sometimes slept "so deep it scares [her.]" (*Id.*). As to personal care, French wrote that she rarely dressed if not leaving the house, showered only twice weekly, performed little hair care, rarely shaved, ate only once daily, and delayed toilet use unnecessarily. (*Id.*). However, French did not require any reminders to perform personal care. (Tr. 251).

French was taking only prenatal vitamins as of the function report, but noted that she forgot to take even those supplements. (Tr. 251). French prepared simple meals in

frequently, and never prepared meals that required significant preparation; she found herself unable to prepare more complex meals and take care of her daughter simultaneously due to a degraded ability to multitask. (*Id*.). She performed light housework, did the laundry and dishes, but noted that if she "didn't have help nothing would get done." (*Id*.).

French took her baby outside for brief outings; she had the ability to drive, but did not feel safe driving because she "can't think straight," and "might not pay attention" to the road. (Tr. 252). She began experiencing dread at the thought of visiting a store several days in advance. (*Id*.). French avoided her creditors, and said she could not maintain checking or savings accounts. (*Id*.).

As to hobbies, French said that she previously enjoyed singing and participating in creative activities like sewing, but lost her interest due to her ailments. (Tr. 253). She continued to watch television and would like to read, but found herself unable to concentrate enough to perform that task. (*Id*.). She felt "overwhelmed by life and tr[ied] to manage just to exist and survive. And now to take care of [her] daughter. Anything more is more than [she could] handle." (*Id*.).

French was with her daughter "constantly," lived with family and friends, and saw her therapist weekly, but did not otherwise socialize. (Tr. 253). She required accompaniment when visiting stores because she "fe[lt] stressed very easily and [would] freeze and have a panic attack if [she] had to split [her] concentration on [her] daughter and the shopping." (*Id.*). However, she could visit stores if she "ha[d] to." (*Id.*). She

8

complained of problems getting along with others, including being kicked out of two housing arrangements, and withdrawing from family and friends. (Tr. 254). She got along with authority figures "until [she] feel[s] bullied or bossed," at which point French "lost control of [herself]." (Tr. 255). She was fired from several jobs for attitude issues and conflicts with clients and her bosses. (*Id*.). She expressed an inability to handle stress, along with feelings of being "overwhelmed." (*Id*.). French reacted to changes in routine with frustration and anger. (*Id*.).

French did not indicate that she suffered any physical restrictions, but instead wrote that she had difficulty seeing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 254). She wrote of halo blindness associated with stress migraines; she suffered from daily headaches, irritability, concentration issues, and problems with concentration. (*Id.*). She also experienced bouts of tiredness, including difficulty walking and lifting her arms. (*Id*.). She had difficulty paying attention to her therapist for her hour-long sessions. (*Id*.). She preferred written instructions to oral because it permitted her to refer back to them several times. (*Id*.).

In the remarks section, French expressed that "literally anything more than existing and caring for my daughter is too much for me to handle. I feel frozen and in a constant state of worry and agony. I feel a constant pit which pulls at me from the inside and feels very heavy and steals my energy making me weak." (Tr. 256). She expressed

the desire to cry constantly, even when she could not point to a specific reason for crying.
(*Id*.). She was overwhelmed, and felt anxiety, worry, and panic attacks. (*Id*.).

### b.      French's Testimony at the Administrative Hearing

At the October 22, 2013, hearing before the ALJ, it was noted that French had her
head down and experienced difficulty catching her breath, along with some difficulty
speaking. (Tr. 47). The ALJ assured French that he was willing to take "5 breaks or 50
breaks" and would "work with" her to ensure she was able to testify. (Tr. 48). French did
not respond well to open ended questions, thus the ALJ switched to a largely yes-or-no
based system of questioning. (Tr. 49). French confirmed that she took sole care of her
child, without much help from others. (Tr. 54). French drove a car once or twice weekly
for medical appointments and to the store for food. (Tr. 55). She did not receive many
visits from friends and family. (*Id*.). She asserted that she had no hobbies, but used a
computer and a cell phone for email and Facebook. (Tr. 56).

French did some cooking, used a dishwasher, and cleaned laundry. (Tr. 58). As to
her activities of daily living, French noted that she made coffee, cleaned, and prepared
food for her daughter. (Tr. 60). French also played with her daughter and read to her, but
reported that she did so inconsistently. (Tr. 60-61). She had some difficulties sleeping.
(Tr. 61).

French then complained that "something is happening to my hands," such that she
could not move her left hand. (Tr. 59). The ALJ then took a brief recess so that French
could recover her composure. (Tr. 60). French began to feel dizzy and lightheaded, but

10

noted that when in her "comfort zone" she did not usually experience difficulty standing, sitting, or walking. (Tr. 62). She admitted that her reaction was "worse than normal," and "never happened like this before." (*Id*.). Her hands were numb, though she again noted that "[i]t never happened like this before." (Tr. 63). French then accounted that it "feel[s] like my bones are curling." (Tr. 66).

French also acknowledged that she "always had trouble . . . keeping a job." (*Id*.). She recounted being terminated from prior jobs for attendance issues, and conflicts with superiors and co-workers. (Tr. 64-66). French also noted that she was barred from seeing a therapist pursuant to her Social Security application because of a confrontation with a security guard. (Tr. 67).

Amy Hellen, who served as a therapist to French and her daughter, then testified to describe French's symptoms at home. (Tr. 45). She worked with French for three months, and noted that French's symptoms at the hearing were "much more severe than [she had] seen in [her] time with [French.]" (Tr. 70). The intensity of the symptoms, along with hand numbness, and duration of French's symptoms were more severe than at home. (Tr. 71).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine French's ability to perform work. (Tr. 71). The VE found that French's past work as a telemarketer was sedentary work. (Tr. 73). The ALJ asked the VE to assume a hypothetical individual with

French's age, education, and work experience, and who had no exertional limitations, but who

> would be limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple, work-related decisions with few, if any, work place changes. This person should have brief and superficial contact with coworkers and supervisors and the general public. There should be no tandem tasks. The individual would be off task up to 8 percent of a day. That is the actual time that an individual is working. However, they can stay on task two-hour segments. And within a two-hour segment, the person could be off task up to 1 minute per hour or 2 minutes during a two-hour period.

(Tr. 74). The VE found that such a worker could perform work available in the national economy, including various types of cleaner, which are medium exertion positions (1,000,000 or more jobs nationally), and various types of housekeeper or laundry worker (367,000 jobs). (Tr. 75).

The ALJ then asked a second hypothetical question which included the prior restrictions, but which also included a restriction that the worker would be off task up to twenty percent of the day. (Tr. 75-76). The VE found that such a restriction would be work preclusive. (Tr. 76).

Finally, the ALJ inquired as to whether a worker who would miss up to two days per month consistently would be able to perform work. (Tr. 76). The VE found that such a limitation would be work-preclusive. (*Id.*).

French's attorney then asked whether a worker who required special supervision or a job coach would be able to perform work. (Tr. 76). The VE confirmed that this restriction would classify the work as "sheltered," and would thus preclude all

12

competitive work. (*Id.*). The VE also confirmed that a worker off task more than ten percent of the day would be precluded from competitive work. (Tr. 77).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

13

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

14

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

15

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

16

> (v)   Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

French argues that the ALJ erred in the following ways: 1) Giving insufficient weight to the opinion of treating physician Dr. Agarwal; 2) Improperly discounting the credibility of French's alleged limitations, and 3) Failing to properly account for French's

moderate limitations to concentration, persistence, or pace. (Doc. 13 at 20-30). These arguments will be addressed in turn.

### 1.   The ALJ Properly Evaluated Dr. Agarwal's Opinion

French first argues that the ALJ erred by giving insufficient weight to the opinion of Dr. Nalini Agarwal. (Doc. 13 at 20). French points to Dr. Agarwal's findings that she was unable to meet competitive standards due to an inability to maintain attention for more than two hours; sustain an ordinary routine without special supervision; complete a normal workday; accept instructions and respond to criticism; respond appropriately to changes; and deal with work stress. (Doc. 13 at 20). Likewise, she notes that Dr. Agarwal found that she suffered from depression, a tendency towards psychosomatic symptoms, marked impairments in all areas of functioning, three episodes of decompensation within a year, and would be absent for more than four days per month. (*Id.*). French asserts that Dr. Agarwal's restrictions are bolstered by clinical his own examination notes, along with therapist notes, and the findings of Dr. Jai Prasad. (*Id.* at 21). French also specifically calls out the GAF score of 42[2] produced by Dr. Charlotte Baker. (*Id.*). Yet Baker's assessment was drafted in June 2014, and was not submitted to the ALJ, who rendered his decision three months prior. (Tr. 36, 629). Consequently, Baker's analysis can play no part in the Court's substantial evidence review of the ALJ's decision.

---

[2] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. A GAF score of 41–50 indicates serious impairments in social or occupational functioning such as an inability to keep a job. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 (6th Cir. 2006).

The ALJ concluded that Dr. Agarwal's opinion merited little weight for several reasons. First, he noted that French's "therapy records and mental status exams do not support such a debilitating condition." (Tr. 33). This rather abbreviated analysis is bolstered by the ALJ's thorough review of French's other medical records. The ALJ notes that French attempted suicide in 2007, but also found that French's severe depression was the result of her mother's death. (Tr. 27). He notes that French reported depression since adolescence, but denied suicidal ideation in 2010. (Tr. 28). The ALJ considered the findings of social worker Dennis Schinzel, who concluded in March and May 2012 that French suffered from depression and anxiety, but had a fair prognosis, and had unimpaired memory, fair judgment, a depressed mood, little insight, normal thought processes, and no suicidal ideation, poor to fair memory, fair insight, and a GAF score of 55-60.[3] (Tr. 28-29). The ALJ gave this opinion great weight, but gave little weight to a June 2012 opinion by Schinzel which diagnosed psychosis. (Tr. 29). Later that month, Schinzel found that French's depression was not of a severe nature. (Tr. 29). Yet later in June, Schinzel concluded that French should be off work for at least six months due to depression; the ALJ discounted this opinion due to its inconsistency with Schinzel's other treatment records. (*Id.*). In August 2012 social worker Leonard Field concluded that French had depressive disorder, post-traumatic stress disorder, and assessed a GAF of 51.

---

[3] A GAF score of 51–60 "indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed. 1994) at 34.

19

(Tr. 30). French was at that time depressed and irritable, with intact memory, judgment, insight, attention, and intelligence. (Tr. 29-30). She also expressed being depressed, anxious, and having difficulty being around others. (Tr. 30). French admitted to a case worker that she had not been taking her medication, but was under stress, had anxiety, racing thoughts, rapid heartbeat, and felt overwhelmed, along with memory and concentration problems. (*Id*.).  In October 2012 French reported to a psychiatrist that she was nervous, angry, anxious, and irritable; she had never taken medication for her mental ailments; the psychiatrist assessed a GAF score of 45-50, along with a fair prognosis. French had intact memory, attention, and concentration at that time. (*Id*.). In December 2012 French was "angry, crying, loud, tense, and verbal, but was also attentive and engaged." (*Id*.). Also in December 2012 social worker Stacy Goodpaster found that French had symptoms of depression, anxiety, panic, and agoraphobia, and that her condition was unlikely to improve; the ALJ gave this opinion little weight because it was drafted after only four treatment sessions, and by a non-medical source (Tr. 30-31). The ALJ further notes that French often missed appointments, refused medication, and that her mental status exams did not comport with her complaints. (Tr. 31).

In January and February 2013 French reported stress from motherhood, and experienced some relief from treatment. (*Id*.). The ALJ also noted that French called the clinic frantically requesting medication refills, only to find out that she had not been prescribed medication. (*Id*.). In April 2013 Dr. Agarwal's found that French was clinically depressed, was sad and tearful, and had "moderate" judgment, insight, anxiety,

and sleep. (*Id.*). The ALJ also notes some findings of William Karl, a chiropractor, but wisely discounted Karl's conclusions on French's mental condition because Karl lacked any expertise in that area. (Tr. 31-32). In May 2013 French reported panic attacks and anxiety. (Tr. 32). In August 2013 French reported feelings of paranoia, depression, and being overwhelmed. (*Id.*).

In September 2013 Dr. Agarwal prescribed Zoloft and Seroquel for treatment of anxiety and depression. (*Id.*). That month Dr. Agarwal also concluded that French could manage her own benefit funds, but would miss more than four days of work monthly, had three or more episodes of decompensation lasting two weeks or longer within one year, and that even a minimal increase in mental demands could bring on episodes of decompensation. (Tr. 33). Dr. Agarwal also assessed a GAF score of 45-50, with a fair prognosis. (*Id.*). The ALJ gave this opinion little weight, as there was no evidence that French experience prolonged episodes of decompensation, and the opinion was inconsistent with Dr. Agarwal's earlier notes, and with French's assertion that she could handle activities of daily living and taking care of her child. (*Id.*).

In December 2013 Dr. Hugh Bray performed a consultative evaluation, finding that French had moderate social limitations, moderate limitations in performing multi-step tasks, but retained the ability to perform simple, repetitive tasks, and could likely complete more tasks; that she had moderate deficits to attention, concentration, persistence, pace, and effort, and to her ability to withstand stress and pressure associated with work activities, and mild limits to her ability to understand, remember, and carry out

simple instructions. (*Id.*). Dr. Bray also noted a tendency to embellish symptomatology. (*Id.*). The ALJ gave this assessment great weight. (*Id.*). Finally, the ALJ gave little weight to consultative physician Jai Prasad's conclusion that French was depressed and very agitated at times. (Tr. 34).

French challenges the ALJ's characterization of the medical evidence, listing numerous transcript citations, but leaves it up to the Court to find specific pieces of evidence supporting her claims. (Doc. 13 at 21). This underdeveloped form of argumentation hews dangerously close to waiver. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

Regardless of whether French waived this argument, the ALJ provided sufficient justification for discounting Dr. Agarwal's opinion. Contrary to Dr. Agarwal's assertion that French experienced three episodes of decompensation lasting two weeks or more within a year, there is no evidence in the medical record that French experienced any episodes of decompensation lasting more than two weeks during her treatment history. (Tr. 598-600). While French's 2007 suicide attempt indicates severe mental illness, she experienced no hospitalization of any kind following that deepest bout of depression. (*Id.*). Likewise, Dr. Agarwal's treatment notes do not support the extreme level of limitation suggested in his opinion. In April 2013 French experienced mild thought process and association limitations, and moderate limitations to judgment, insight,

anxiety, and sleep; French subjectively reported stress, crying, and sadness. (Tr. 579). In May 2013 Dr. Agarwal found that French had mild anxiety and sleep issues, and reported paranoia, anxiety, and depression. (Tr. 577). In September 2013 he found that French suffered from only mild anxiety, without limitation to judgment or thought processes, and instead simply reported stress. (Tr. 574).

French's other treatment notes demonstrate that she consistently experienced depression and anxiety, but do not corroborate Dr. Agarwal's strict limitations and finding of three episodes of decompensation. While French's therapist found that she was consistently anxious, and depressed, she also wrote that French was engaged, cooperative, and was maintaining her mental status. (Tr. 501, 502, 509, 510, 513, 517, 521). However, several records note subjective reports in terms of concentration, memory, and maintaining daily functioning. (Tr. 550, 564, 566, 619).

While French's medical records leave no doubt that she was depressed and anxious throughout her treatment sessions, the ultimate question is how well French could function despite her mental ailments. The ALJ supportably concluded that Dr. Agarwal's September 2013 opinion significantly overstated French's degree of limitation. "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace . . . demonstrated by exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a

23

combination of the two)." 20 C.F.R. Subpt. P, App. 112.00C(4) (2009). French experienced distress throughout her treatment record, but there is no indication that she experienced sudden downturns in her condition following her 2007 hospitalization, nor did she require any form of hospitalization or urgent treatment post-2007. Dr. Agarwal's readily dispelled misstatement on this issue provides good reason to doubt his other, less objective findings.

The ALJ also reasons that Dr. Agarwal's opinion is internally inconsistent because he concludes that French suffered from extreme limitations, but nonetheless could manage her own benefits. (Tr. 33). Dr. Agarwal specifically noted in his check-the-box form that French suffered from "[i]mpairment in impulse control," "[d]ifficulty thinking or concentrating," "[p]aranoid thinking," "[p]erceptual or thinking disturbances," "[e]asy distractibility," and [m]emory impairment – short, intermediate or long term," all of which might be expected to interfere with management of benefits. (Tr. 595). These reasons inconsistencies are sufficiently good reasons to discount Dr. Agarwal's opinion.

French also cites the findings of Dr. Jai Prasad, who performed a physical evaluation of French, but who also noted that she experienced "mental depression," "headache," and "lack of concentration + focus." (Tr. 613). Ignoring Dr. Prasad's lack of specialization in matters of mental health, his findings are merely consistent with a finding that French experienced concentration issues and depression. These observations do not support Dr. Agarwal's highly restrictive opinion, and do not support his finding that French experienced three or more episodes of decompensation.

24

French also argues that her GAF scores declined as time went on, ultimately coming to rest at 42, indicating worsening of her mental wellbeing. (Doc. 13 at 21). GAF scores "have no direct correlation to the severity requirements of the mental disorders listings," and are thus of limited use in assessing residual functional capacity. *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007). GAF scores are also highly subjective, and GAF scores assigned by different clinicians are effectively impossible to compare. *See Kroh v. Colvin*, No. 3:13-CV-01533, 2014 WL 4384675, at *18 (M.D. Pa. Sept. 4, 2014) ("GAF ratings assigned by different clinicians are inconsistent and adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation.") (quotation omitted). In this case, the GAF score of 45 to 50 was produced by social worker Dennis Schinzel (Tr. 585), and the GAF score of 55 was produced by psychiatrist M. Watton (Tr. 419). There is no clear consistency between these figures, and they offer little insight into French's true mental wellbeing.

### 2.      *French has Waived her Arguments on Credibility*

The next section of French's brief is entitled "[t]he ALJ made impermissible credibility findings and not give the proper weight to the complaints of psychiatric limitations indicated by the Plaintiff." (Doc. 13 at 23). She also asserts that "the consistent and medically supported complaints of psychiatric disabilities and physical manifestations of the mental disabilities were not given deference." (*Id*. at 24). Yet French specifically mentions only one piece of medical evidence supporting her claim for

25

disability: a finding of "widespread psoriasis that was cited by both Dr. Karl, a treating medical source and Dr. Prasad, a consultative examiner." (*Id*. at 27). French does not clarify how a finding of widespread psoriasis supports her claim for disability; thus, she has waived them.

It is well settled that where a Social Security claimant makes arguments which are "adverted to in only a perfunctory manner," those arguments "are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality, L.L.C. v. City of Grove City, Ohio*, 350 Fed. Appx. 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed....Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 1310325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner).

Even had French developed this argument, there is no evidence in the record that her psoriasis, alone or in combination with other impairments, was so severe as to be disabling. Therefore, I suggest that the ALJ's findings are supported by substantial evidence.

### 3.   *The ALJ Properly Accounted for French's Concentration, Persistence, or Pace Limitations*

Finally, French argues that the ALJ failed to properly account for her moderate limitations to concentration, persistence, or pace. (Doc. 13 at 27-30). She argues that the ALJ's finding that she suffers from a moderate limitation to concentration, persistence, or pace required that he specifically provide for those limitations in his questions to the ALJ. (*Id*. at 28-29). She cites two cases which she asserts stand for this proposition. First, she cites *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007), wherein it was found that a limitation to "simple, routine, repetitive" work was insufficient to account for moderate limitations to concentration, persistence, or pace. She also cites *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005), in which the court found that a moderate limitation to concentration, persistence, or pace was not adequately compensated for by limitations relating to co-contact with co-workers, supervisors, and the public, along with a limitation to simple, routine, unskilled work.

In some cases, courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.*, No. 10–CV–12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011), Report & Recommendation adopted, No. 10–12519, 2011 WL 2682892 (E.D. Mich. July

27

11, 2011). "[T]here is no bright-line rule requiring remand" in these circumstances. *Roberts v. Comm'r of Soc. Sec.*, No. 10–cv–14064, at *8 (E.D. Mich. Aug. 8, 2011), Report & Recommendation adopted by 2011 WL 4406344, at *1 (E.D. Mich. Sept. 22, 2011). Instead, "this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Id*.

While the ALJ did not specifically mention the term "moderate limitations to concentration, persistence, or pace" in his questions to the VE, he adequately accounted for French's limitations with a myriad of restrictions. The ALJ's RFC and related hypothetical included limitations to simple, routine, repetitive work, without fast paced production, including only simple work related decisions, brief and superficial contact with others, no tandem tasks, and permitted French to remain off task eight percent of the time. (Tr. 25). These restrictions address every element of French's concentration, persistence, or pace limitations. French gives no indication of why these restrictions do not account for her moderate limitations to concentration, persistence, or pace. Courts within this circuit have found that similar limitations adequately accounted for moderate deficits to concentration, persistence, or pace. *See Copfer v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV2279, 2014 WL 6879536, at *20 (N.D. Ohio Dec. 5, 2014) ("Copfer contends that the ALJ's RFC assessment limiting him to simple, routine tasks does not adequately account for his moderate limitations in maintaining concentration, persistence or pace . . . . Copfer ignores the fact that the ALJ also limited him to a work setting without frequent changes or fast pace requirements and only superficial social interactions . . . . Copfer

28

does not explain how these additional restrictions do not adequately account for his moderate limitations in maintaining concentration, persistence or pace."); *Black v. Comm'r of Soc. Sec. Admin.*, No. 5:11CV2770, 2012 WL 4506018, at *14 (N.D. Ohio Sept. 28, 2012) (finding that a hypothetical which included limitations to simple, routine repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple, work related decisions, and routine work place changes, along with superficial and indirect interaction with the public, and only occasional interaction with coworkers adequately accounted for moderate deficits to concentration, persistence, or pace). The ALJ was required to account for French's credible limitations to concentration, persistence, or pace in his RFC finding. He was not obligated to use any particular words in accounting for those limitations, and the limitations he provided adequately compensated for French's limitations.

French also briefly notes that "[i]t is peculiar that Judge Mason provided a hypothetical example which indicated that Ms. French would be off task 8% of the time at the hearing when the vocational testimony indicated that 10% would preclude all competitive employment." (Doc. 13 at 29). Noting that some element of an ALJ's decision is "peculiar" is not a developed argument, if indeed it can be characterized as an argument at all. Whatever claims French may seek to raise on this issue are waived.

French notes that "factors such as medication side effects, daily activities, and pain symptoms are not addressed in compliance with the statutory requirements." (Doc. 13 at 29). The ALJ expressly stated that all the evidence was considered and, when making the

credibility determination, specifically referred to and considered Plaintiff's daily activities, symptoms, pain, and limiting effects of her symptoms. (Tr. at 25-34.) The ALJ's analysis was sufficient under 20 C.F.R. § 404.1529(c)(3) and this argument does not merit remand.

French next asserts that "the ALJ's questioning and her ability to participate in the hearing were clearly compromised." (Doc. 13 at 29). To the extent this argument raises any issue with the ALJ's conduct, I note that the ALJ deferred to Plaintiff at the hearing, and offered to take as many breaks as needed to accommodate French's emotional state. (Tr. 48). To the extent that this assertion argues that Plaintiff's behavior at the hearing is some proof of disability that the ALJ should have considered, the ALJ referred to and considered Plaintiff's testimony. (Tr. at 25-26.) Therefore, this assertion does not undermine the ALJ's decision.

French also asserts that "[t]he fact that at the time of the hearing Ms. French was taking Zoloft and Seroquel . . . was not discussed at the hearing and the side effects of the medications was not mentioned in the decision." (Doc. 13 at 29-30). However, the ALJ expressly discussed French's medication use at least nine times in his decision, including her repeated preference to avoid medicinal treatment, and her eventual use of Zoloft and Seroquel. (Tr. 27-32).

While the ALJ did not specifically discuss side effects in the medicine in his decision, he inquired at the hearing as to whether "the medications seem to help" or whether they "make you tired, or what do the medications do?" (Tr. 68). French did not

30

testify to any side effects, nor does she complain of any significant side effects of her medication in the medical record. While the ALJ was obligated to "consider" the side effects of French's medication, he was not obliged to specifically mention that finding in the decision. *See Hale v. Comm'r of Soc. Sec.*, No. CIV. 10-10751, 2011 WL 1641892, at *4 (E.D. Mich. May 2, 2011) (holding that an ALJ's hearing questions regarding the side effects of medication discharged the ALJ's duty under 20 C.F.R. § 404.1529 (c)(3)(iv)). I suggest no error can be found here.

In sum, while French undoubtedly suffers from severe, long-term depression, anxiety, and associated symptoms, the ALJ adequately accounted for those limitations and found that they did not preclude French from performing work available in significant numbers in the national economy. The ALJ properly considered the findings of Dr. Agarwal, and accounted for French's moderate limitations to concentration, persistence, or pace. I therefore suggest that the ALJ's findings are supported by substantial evidence.

###    H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that French's Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve

31

and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 30, 2016                                    S/ PATRICIA T. MORRIS
                                                       Patricia T. Morris
                                                       United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 30, 2016                                By s/Kristen Krawczyk
                                                   Case Manager